## 135-43 126 Holdings Corp. v Guzman

2026 NY Slip Op 30574(U)

February 24, 2026

Civil Court of the City of New York, New York County

Docket Number: Index No. 301688/2023

Judge: Jack Stoller

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART R
------------------------------------------------------------------X
135-43 126 HOLDINGS CORP.,

                                        Petitioner,

                                                                Index No. 301688/2023

            -against-

ROSA GUZMAN,

                                                                DECISION/ORDER
                                        Respondent.
------------------------------------------------------------------X
Present:   Hon. Jack Stoller
           Judge, Housing Court

        135-43 126 Holdings Corp., the petitioner in this proceeding ("Petitioner"), commenced

this summary proceeding against Rosa Guzman, the respondent in this proceeding

("Respondent"), seeking a money judgment and possession of 405 East 117th Street, Apt. 1A,

New York, New York ("the subject premises"), on an allegation of nonpayment of rent.

Respondent interposed an answer amended on March 25, 2024 with defenses of laches, tender

and refusal, payment, breach of the warranty of habitability, and that MDL §302(1)(b) precludes

collection of rent, and counterclaims for breach of the warranty of habitability, harassment, an

order to correct, and attorneys' fees.  The Court held a trial of this matter on March 5, 2025,

August 15, 2025, and November 20, 2025 and adjourned the matter for post-trial submissions,

ultimately to February 13, 2026.

**The trial record**

        Petitioner proved that it is a proper party to commence this proceeding; that the parties

are in a landlord/tenant relationship with one another; that Respondent is protected by the Rent

Stabilization Code; that Petitioner has satisfied the registration requirements of 9 N.Y.C.R.R.

1

[* 1]

§2528.3 and MDL §325; that Respondent owed rent arrears; and that Petitioner demanded payment of rent pursuant to RPAPL §711(2).

Petitioner submitted into evidence a two-year lease commencing on July 1, 2019 with a monthly rent of $997.73. Petitioner submitted into evidence a two-year lease commencing on July 1, 2021 with a monthly rent of $1,007.70. Petitioner submitted into evidence a two-year lease commencing on July 1, 2023 with a monthly rent of $1,058.08. Petitioner submitted into evidence a rent breakdown showing that after the commencement of the lease, Petitioner received one payment of $997.53, one payment of $990.92, one payment of $3,000, one payment of $1,000, one payment of $998, one payment of $1,996, seven payments of $997.60, one payment of $1,992.90, two payments of $997.50, one payment of $2,000, one payment of $958.92, one payment of $1,132, one payment of $2,0461, two payments of $1,007.70, one payment of $1,100, one payment of $3,071.06, one payment of $754.64, one payment of $997,73, and a payment on February 7, 2024 in the amount of $15,468.16 from the Emergency Rental Assistance Program ("ERAP"). The rent breakdown shows that Respondent moved into the subject premises on August 2, 2017.

Nadav Cohen ("Manager") testified that he does not register the subject premises with DHCR; that he does not have a rent registration for the subject premises; that there is a big balance for the rent; that the subject premises is on the ground floor; that there may be one other apartment on the ground floor, but he forgot; that he has managed the building in which the subject premises is located ("the Building") for four years; that there was a commercial store on the ground floor before he was managing the Building; that there is no commercial store now; that he did not know the configuration of the subject premises because his state of mind was that

2

[* 2]

Respondent reconfigured the subject premises; and that he has never been inside the subject premises.

Manager testified on cross-examination that sometimes someone who works for Petitioner makes a correction to a rent breakdown if rent is not added or if it is added twice.

Petitioner submitted into evidence an I-card[1] dated October 5, 1938 that stated that the Building had no apartments in the cellar, one apartment on the first floor, two apartments on each of the four floors above that. Petitioner submitted into evidence HPD records showing that HPD dismissed violations dated March 16, 2002 and February 29, 2003 requiring that the owner file plans and an application to legalize an alteration or to restore to the legal condition existing before the alteration a subdivision of apartment 1B at the Building into two units.

Respondent submitted into evidence a summons and complaint dated May 31, 2023 in the ejectment action 135-43 126 St Holdings Corp v. Guzman, that alleged that Respondent intruded or squatted upon the premises in violation of the certificate of occupancy. Respondent submitted into evidence holdover petitions, all captioned at 135-43 126 St Holdings Corp v. Guzman. In the first holdover petition, which does not have an index number, Petitioner alleged that Respondent squatted in the "store". The second holdover petition, predicated on a notice to quit dated March 24, 2022, had an index number of 305700/2022, and was discontinued without prejudice. The third holdover petition, seeking the same relief and predicated on a notice to quit effective July 31, 2022, had an index number of 300843/2022. The Court granted a cross-motion to dismiss for lack of subject matter jurisdiction and a failure to adequately describe the subject

---

[1] I-cards provide evidence of an inspector's observations and thus of the nature of the use or occupancy. Matter of 345 W. 70th Tenants Corp. v. N.Y.C. Envtl. Control Bd., 143 A.D.3d 654, 654-55 (1st Dept. 2016).

3

[* 3]

premises by an order dated April 21, 2023. Two of the holdover petitions sought judgments for use and occupancy.

Respondent testified that there is a small space where you find mailboxes and then a small hallway that leads directly to the subject premises and that the subject premises has two doors. Respondent submitted into evidence photographs of the façade of the Building, one of which shows the common hallway with two doors that say "1A" on them. The photographs also show one apartment, "1A" on the doorbell and the mailboxes.

Respondent testified that she moved into the subject premises in 2001; that she last paid rent for the subject premises in 2022 when they brought her to Court; that she paid rent monthly directly from her bank account to Petitioner; and that Petitioner blocked her from paying the rent.

Respondent submitted into evidence a printout of an online payment that said that she currently could not make payments online and to contact Petitioner for information.

Respondent testified that she was not given an alternative means of payment; that she asked Petitioner why; that Petitioner said that they did not want her in the subject premises and that she should just leave; that she has not had access to the portal since May of 2022; that she has not checked to see if she still lacks access; that when she moved into the subject premises, it was not the only apartment on the first floor; that there was another apartment on the first floor; that there were two rooms; that there was a lady named Ramonita Baez ("the Other Occupant") who lived there; that there was another apartment called "1A"; that she did not have access to the apartment that was not hers that was labeled "1A"; that this other apartment had an entrance door to the lobby; that there is currently one apartment on the first floor; that in 2005, when the landlord, Rufina Echevarria ("the Prior Landlord"), died, the City took over the Building; that in 2006, evaluations took place and they found that the Other Occupant was occupying an illegal

4

[* 4]

space that did not have a kitchen or a bathroom; that the Other Occupant was moved to a building owned by the Department of Housing Preservation and Development of the City of New York ("HPD"); that in 2007 repairs in the Building took place; that HPD broke the wall and gave her the whole apartment from the front to the back; that she paid one bill for electricity; that there is one bathroom and one kitchen; that there is no commercial space or store on the first floor currently; that when she moved in 2001 there was no commercial space or store on the first floor; that there is another door on the first floor behind the stairwell besides the two doors in the photograph that leads to the basement; and that Petitioner's portal has a means by which to register a complaint about the subject premises.

Respondent submitted into evidence complaints that she put on the portal, on December 10, 2020 for the door and the outlet and later complaints about the door dated March 9, 2022 and September 7, 2022. Respondent testified that the entrance door to the subject premises moved and was not operable; that the outlets were not good; that the paint was deficient and crumbling as well; that there was a leak in her children's room; that she has been writing this in the app since 2020; that the condition of the door and the leak still exist; that Petitioner painted and fixed cabinets in 2024 when the cold was starting; that Petitioner fixed the leak but not properly, so the leak recurred and is currently active in her children's room; that Petitioner has expressed to her many times that it wants her to move out; that one day in 2020 she was cleaning the subject premises and someone named Mr. Joshua ("Petitioner's Representative") knocked on her door and offered her $25,000 to move out; that she told him she was unwilling to move out; that these offers happened at least five times, most recently on February 18, 2025; that these offers were never in writing; that they called her from the office and told her that she owed an enormous

5

[* 5]

amount of money and that she should leave; that they could cancel her debt; and that she had the number of the person who called her on her phone.

Respondent testified on cross-examination that the door that she used the door at the end of the hall when she moved in, which corresponds to the back of the Building; that she had no access to the other door in the photograph from when she moved in until about 2007; that in 2006 the City took "evaluations"; that she communicated with the City in 2006; that HPD broke the wall and gave her the whole apartment; that she communicated with HPD in Spanish;[2] that she did not remember the month that HPD broke the wall; that the breaking of the wall took one year of repairs which ended in 2008; that she did not receive paperwork from HPD; that there was a process according to which the apartment was altered; that someone from HPD did not break the wall; that the Prior Landlord had died so the Prior Landlord had not hired someone; that after the Prior Landlord died she paid rent to an administrator assigned by HPD; that she got something in writing from the administrator; that a company whose name she did not remember broke the wall; that the administrator moved her from the Building because the main foundations of the Building were cracked; that the administrator did not relocate the Other Occupant; that her ex-husband has access to the basement; that she does not have access to the basement; that her ex-husband works for Petitioner now picking up garbage and mopping the Building and receiving complaints about apartments in the Building; that she complains to her ex-husband about conditions in the subject premises; that her ex-husband is not the one who fixed the subject premises except that her ex-husband painted the subject premises; that her ex-husband lived in the Building when they were together; that her ex-husband does not live there now; that they have been separated for eleven years; that they have a daughter who lives with her and her ex-

---

[2] Respondent used a Spanish interpreter at the trial.

6

husband takes care of her daughter when she goes to work; that her ex-husband has access to the subject premises because her ex-husband takes care of their daughter; that they are friends; that when her ex-husband picks their daughter up from school, her ex-husband brings their daughter to subject premises and stays there until she comes home; that her ex-husband did not live in the basement; that her ex-husband lives with a different daughter of his on 25th Street; that she does not get into contact with Petitioner's Representative; that her ex-husband gets in touch with Petitioner's Representative; that Petitioner's Representative did not speak to her on the phone and they did not text; that Petitioner's Representative spoke to her in person in Spanish; that she did not record the conversation; that she did not reach out to her attorney; that Petitioner's Representative spoke to her on the phone on February 18, 2025; that she did not record the conversation; that she told Petitioner's Representative to contact her attorney; that Petitioner's Representative wanted her to pay rent right there and then; that she went to her attorney's office after that; that she did not reach out to Petitioner about being cut off from the portal; that she did not mail or give a check to Petitioner's office or her attorney; that she did try to pay something after December of 2022 because she was in Court at that point on three different cases; that she spoke to someone with a 516 area code who told her that she owed a lot of money; that she did not ask for information about how to pay that money; that she did not direct that person to contact her attorney about arrears; that she told the person to offer her money in Court and she asked them not to call her again; that if he called her again she would inform her attorney; that she in fact informed her attorney; that she does not have a payment with her this day; that she believes that rent is owed; that this conversation was in English; that she said she wanted to stay and pay rent; and that her eldest son was present and was translating for her.

7

[* 7]

Respondent testified on redirect examination that when she was approached about buyouts; that it was a mix of phone conversations and in-person conversations; that she spoke to three different people as such; and that the same person who made offers to her made offers to others.

Respondent submitted into evidence a deed executed on January 10, 2007 which shows a representative of the estate of the Prior Landlord as the grantor.

Respondent testified a second time that on June 17, June 18, June 19, July 16, and July 31 of 2025, two people, including one who she thought was named "Mike", called her from Petitioner's office telling her to pay the rent and that she should leave and that the person sitting with Petitioner's counsel in the courtroom came to the subject premises twice at the beginning of this case to offer her to sell the subject premises.

Respondent testified on cross-examination that she did not record the phone conversations; that she got a text from the person who called her; that she did not ask the name of the second person who called her; that the second person who called her identified herself but did not give a name; that "Mike" called her on all dates except July 31; that the second person called her on July 31; that the person sitting next to counsel is "Charlie"; and that he did not give her anything in writing.

Respondent submitted into evidence records from the New York City Department of Buildings ("DOB"). One such record was a certificate of occupancy dated October 5, 1938 which showed that the subject building has had a cellar, a store and a tenement on the first story, and a tenement on the second to fourth stories. Another such record is another violation dated July 25, 2003 for partitions erected to create a class "A" apartment with a two piece bathroom, one bedroom and kitchen area with hot plate, that required to obtain a permit or restore to the

8

[* 8]

prior legal condition. A certificate of correction was disapproved. Another record is an application dated May 30, 2007 for a permit to legalize the existing condition and amend the existing certificate of occupancy. Another record is a violation for occupancy contrary to certificate of occupancy, to wit, two class "A" apartments in a space where the use provided for one class "A" apartment. A certificate of dismissal was submitted on November 1, 2018 and disapproved on the same date. Another such record was a violation dated October 18, 2021 for a failure to maintain the Building in a code-compliant manner for the cellar being occupied as a single-room occupancy ("SRO") with no second means of egress. The record shows that Petitioner submitted a certification of correction on November 10, 2021. Another such record is another violation dated October 18, 2021 for a residence having been converted, maintained, or occupied as a dwelling for more than the legally approved number of families authorized by the certificate of occupancy. The record shows that Petitioner submitted a certification of compliance on November 10, 2021.

Charles Medina ("Property Manager") testified that he has been a property manager for eight years; that he visited Respondent to see why they were not getting rent; that he was questioning Respondent about the two rooms that were illegal; that he made the appointment with Respondent; that when the case started he was trying to settle the case; that he spoke with Respondent in Spanish; that Respondent's son and daughter were there as well; that the subject premises is a small one-bedroom apartment with a kitchen and a bathroom and a backyard; that the two rooms that were a store were converted into two bedrooms; that Respondent occupies the whole of the subject premises; that Petitioner did not do anything with regard to the layout of the subject premises; that the Fire Department inspected and saw someone living in the basement and they got a vacate order; that they found illegal two bedrooms in the store; that he spoke to

9

[* 9]

Respondent about the front part of the building; that HPD did the conversion of the Building; that Respondent had the paperwork and the proof; that he asked Respondent to send the documentation to him; that he had not seen any permits; that Respondent said that this was done during the pandemic; that he asked what it would take to satisfy and settle the case; that Respondent said that she would not settle for less than $75,000; that Respondent did not show him proof; that Respondent's husband was living in the basement; that he came to the subject premises during the pandemic; and that he spoke to Respondent on the phone.

Petitioner submitted into evidence HPD violations dated February 28, 2003 for the primary means of egress being unsafe and defective.

Fred Gualario ("the 7A Supervisor") testified that he works for HPD; that he checked the records for the Building; that the Building was in the 7A program[3] in 2003 and was discharged in 2006; that between 2003 and 2006 there was a scope of work for HPD to do; that a permit was pulled; that a contractor was engaged; that a permit was pulled to convert an illegal apartment back to legal status; that the certificate was amended also; that there was a bathroom that was pushed into a storefront on the first floor that took away space form the storefront; that this was an illegal conversion; that HPD relegalized it while the 7A administration was in effect; that there was a change in the certificate of occupancy; that they either allowed it to say or converted it to the original layout; that he did not know which one they did; that there electric and framing and joist work was done; that there bathrooms and kitchens were replaced; that the 7A administrator would have contracted out to do the work; and that there was a sign-off.

---

[3] Article 7A of the RPAPL provides for a special proceeding that directs payments of rent be collected by an administrator appointed by the Court to effectuate repairs.

[* 10]

The 7A Supervisor testified on cross-examination that new electric and new plumbing were put in; that repairs were done to the bathroom, kitchen, and sloping floors; and that he did not go to the Building and did not know if the work was completed.

**Discussion**

The violations in evidence make clear that the use of the subject premises differs from the use specified in the certificate of occupancy for the subject premises. A landlord may not collect rent from a tenant under these circumstances. MDL §302(1)(b). Petitioner's closing statement made equitable arguments for ruling in a manner other than what the statute provides. Even if a judicially-carved-out exception to the statute make sense from a practical point of view, such an exception would be inconsistent with the statute. Chazon, LLC v. Maugenest, 19 N.Y.3d 410, 415-16 (2012). Respondent therefore states an absolute defense to Petitioner's cause of action. Id., Pei-De Tsai v. JCHHB, Inc., 233 A.D.3d 420, 421 (1st Dept. 2024), 513 W. 150 Gardens v. Simmons, 84 Misc.3d 132(A)(App. Term 1st Dept. 2024).

Respondent counterclaimed for an order to correct. Petitioner did not rebut Respondent's testimony that her door needs repair and that a leak that Petitioner had previously addressed had recurred. As Respondent was not more specific and as there is no HPD violation, Respondent's remedy is to have the Court direct Petitioner to inspect and repair the conditions as legally required.

Respondent counterclaimed for damages for breach of the warranty of habitability. The rent reserved in the lease comprises the basis for such damages. Park West Management Corp. v. Mitchell, 47 N.Y.2d 316, 329, *cert. denied*, 444 U.S. 992 (1979), Elkman v. Southgate Owners Corp., 233 A.D.2d 104, 105 (1st Dept. 1996). As Respondent's lawful rent is zero up to this point, there is no baseline upon which to award a rent abatement.

11

[* 11]

Respondent interposed a counterclaim sounding in harassment, seeking civil penalties, an injunction, and damages. Petitioner did not rebut Respondent's testimony that Petitioner's agents repeatedly told her that she had to move out and made buyout offers to her, conduct that constitutes harassment as defined by N.Y.C. Admin. Code §27-2004(a)(48)(f-2), in violation of N.Y.C. Admin. Code §27-2005(d).

Tenants who prove harassment may obtain an injunction restraining a landlord from engaging in such conduct and civil penalties payable to the New York City Commissioner of Finance not less than $2,000 nor more than $10,000. N.Y.C. Admin. Code §27-2115(m)(2). Tenants who prove harassment may also obtain compensatory damages, punitive damages, and attorneys' fees. N.Y.C. Admin. Code §27-2115(o). A proper measure of compensatory damages in a harassment case can be a rent abatement. Guang Y. Leung v. Zi Chang Realty Corp., 2022 NY Slip Op 50034(U)(App. Term 1st Dept.). For reasons explained above, there is no baseline upon which the Court can award a rent abatement. Compensatory damages cannot otherwise be contingent or speculative, but ascertainable to a degree of reasonable certainty. E.J. Brooks Co. v. Cambridge Sec. Seals, 31 N.Y.3d 441, 448-49 (2018). The record does not show damages as such. In the absence of such proof, the Court can award Petitioners compensatory damages of $1,000.00. N.Y.C. Admin. Code §27-2115(o).

Punitive damages should bear some reasonable relation to the harm done and flagrancy of the conduct causing it. Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 193-94 (2008). The scale of the harassment proven here was less than that incurred by changing locks and discarding personal property which warranted $5,000, Caban v. Silver, 2019 N.Y.L.J. LEXIS 458, *17 (Civ. Ct. Kings Co.), or a long-term course of egregious conduct that warranted an award of $4,500. Leung v. Zi Chang Realty Corp., 2022 N.Y. Slip Op. 50034(U) (App. Term

12

[* 12]

1st Dept.). On this measurement, the "harm" and "flagrancy" shown in this matter amounted to $1,500.

Respondent also counterclaimed for attorneys' fees, both as a contractual matter and by reference to N.Y.C. Admin. Code §27-2115(o). An award of attorneys' fees typically awaits the ultimate outcome of the proceeding. As this decision renders an ultimate outcome, it is now ripe for a motion on Respondent's part for attorneys' fees.

Accordingly, it is

ORDERED that the Court dismisses the petition, and it is further

ORDERED that the Court dismisses Respondent's counterclaim sounding in breach of the warranty of habitability, and it is further

ORDERED that the Court grants Respondent's counterclaim for an order to correct to the extent of directing Petitioner to inspect and repair as legally required a leak and a door in the subject premises on or before March 31, 2026, with access to be arranged by the parties and/or counsel for the parties, and it is further

ORDERED that the Court grants Respondent's counterclaim for harassment to the extent of awarding Respondent a judgment against Petitioner in the amount of $2,500, to the extent of imposing a civil penalty of $2,000 on Petitioner, which can be enforced in rem against the Building, and to the extent of permanently enjoining Petitioner from engaging in acts of harassment against Respondent as defined by N.Y.C. Admin. Code §27-2004(a)(48), and it is further

13

[* 13]

ORDERED that this order is without prejudice to Respondent's motion for a judgment in attorneys' fees.

This constitutes the decision and order of this Court.

Dated: February 24, 2026
      New York, New York

                                                        _____
                                                         HON. JACK STOLLER
                                                            J.H.C.

APPROVED
JSTOLLER , 2/24/2026, 4:39:29 PM

14

[* 14]